**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

JOSE LUIS GONZALEZ-FLORES,
            *Defendant-Appellant.*

No. 03-10656

D.C. No.
CR-03-00650-SMM

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Submitted April 11, 2005*
San Francisco, California

Filed August 12, 2005

Before: Donald P. Lay,** Betty B. Fletcher, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Betty B. Fletcher

---

*This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

## COUNSEL

Paul J. Mattern, Phoenix, Arizona, for the defendant-appellant.

Joan G. Ruffennach, Assistant U.S. Attorney, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

Defendant-appellant Jose Luis Gonzalez-Flores ("Gonzalez") was convicted of alien smuggling for leading a group of nearly two dozen Mexicans into the United States across the desert. In this direct appeal, Gonzalez claims that the evidence was insufficient to support his conviction and that certain testimony admitted at trial was irrelevant and unduly prejudicial. Gonzalez also attacks his sentence on *Booker* grounds; the government argues in response that he waived his Sixth Amendment rights.

We hold that the evidence was sufficient to support the conviction and that the error arising from the admission of the prejudicial testimony was harmless, and therefore we affirm the conviction. However, we reject the government's contention that Gonzalez waived his Sixth Amendment rights when his attorney moved to exclude the prejudicial testimony. We therefore remand the case pursuant to *United States v. Ameline*.

## I.   BACKGROUND

Gonzalez was convicted on one count of bringing in illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(i). The following facts emerged at trial:

In late May 2003, a group of twenty-three Mexican nationals set out on foot from Mexico across the desert into the United States. Three members of the group were detained by a border patrol agent on a road near Interstate 8 in Arizona; these individuals told the agent that there were approximately twenty other members of their group still in the desert. A search and rescue operation was initiated, and border patrol agents found nineteen members of the group in the desert. Two teenage girls from the group were suffering from severe heat exhaustion and respiratory problems and were airlifted to a hospital. Another agent, responding to a report of an illegal alien, encountered and detained Gonzalez at a barn off I-8 near Yuma, Arizona.

Three members of the group, Miguel Gonzalez-Flores (no relation to defendant), Eduardo Salinas-Zagal, and Everardo Salinas-Zagal (Eduardo's brother), were detained as material witnesses and deposed on videotape two weeks after the crossing.[1] Gonzalez's lawyer cross-examined the witnesses in the videotaped depositions.

---

[1]To avoid confusion, we refer to the deposed witnesses by their first names.

The videotapes of the three depositions were played for the jury. All three witnesses testified that they were Mexican nationals and that, led by the defendant, they had crossed the border other than at a port of entry. Miguel met the two brothers at a border town in Mexico, and they discussed hiring a guide to help them walk across the border. They then met Gonzalez, who indicated that he knew the way through the desert, and so they went with him. They expected to pay Gonzalez for being their guide.

Gonzalez led a group of nearly two dozen people — including Miguel, Eduardo, and Everardo — through the desert and across the border. The group spent a full night and half a day walking in the desert. At some point during the trek, the group ran out of water, and Gonzalez left the group to go look for some. Sometime thereafter, border patrol agents found the group.

The initial indictment charged that Gonzalez placed lives in jeopardy in connection with the offense. Noting that any injuries to members of Gonzalez's group would not go to an element of the crime of bringing in aliens, the court questioned the parties prior to trial as to the propriety of including this fact in the indictment. Gonzalez's lawyer argued: "Since it's only a sentencing issue, I don't think we should concern the jury with it. . . . I don't believe it should be included in the indictment or brought to their attention or have them in any way find anything about it." Gonzalez himself made no statement on the matter. The court ruled that the matter of the harm to others was a sentencing issue and not an element; consequently, evidence of the injuries sustained by individuals Gonzalez brought across the border should be presented at sentencing rather than to the jury at trial.[2]

---

[2]This discussion took place on September 2, 2003, more than nine months before the Supreme Court decided *Blakely v. Washington*, 542 U.S. 296 (2004).

Just before the commencement of the trial, however, the court revisited the subject of the group members' injuries. Gonzalez's lawyer asked the judge to confirm that no testimony as to the two girls' heat stroke would be permitted and suggested he would stipulate to the injuries, if necessary, at sentencing. The government responded that the girls' distress "was an important part of the event, and it's certainly relevant with respect to sentencing issues." The court ruled: "I don't want to get too far afield if that's not an element of the offense, if it's a sentencing issue. But I think the government is entitled to some latitude . . . and I'm going to allow [the government] to get into some of that evidence, about the results of what happened. So your objection's overruled."

During the trial, a border patrol agent described finding the two girls, who needed "immediate medical care, advanced medical care." The agent characterized the cause of the medical distress as "[h]eat exhaustion turning into heatstroke." According to the agent, during the helicopter flight to the hospital, one of the girls stopped breathing and required resuscitation by rescue breathing.

At the close of the government's case, the defense moved for a judgment of acquittal and for a mistrial because the admission of the evidence of the two girls' heat stroke violated Federal Rules of Evidence 402, 403, or both. The court denied both motions. As to the mistrial motion, the court explained that the testimony in question "helps to explain the circumstances of the other testimony of why [Gonzalez] left to find water and to determine whether he was in fact assisting in bringing people into the United States." Additionally, the court didn't "believe it was so prejudicial."

Gonzalez presented no defense; the jury convicted him. Reiterating the evidentiary argument about the two girls' heat stroke (among other arguments), Gonzalez moved for a new trial. The court denied the motion, once again finding that the

probative value of the heat stroke testimony outweighed any possible prejudicial value.

The presentence report (PSR) recommended three sentence enhancements for specific offense characteristics: (1) the number of aliens smuggled; (2) the fact that Gonzalez brought people into the desert with insufficient water, thereby recklessly creating a substantial risk of death or serious bodily injury; and (3) the fact that the two girls suffered severe heat distress, which constituted serious bodily injury sustained in connection with the offense. Gonzalez objected to the last of these enhancements, arguing that the PSR overstated the seriousness of the injuries and as a result added too many levels. The district court accepted the base offense level from the PSR, granted a two-level downward departure, and sentenced Gonzalez to 33 months in prison (the low end of the Guideline range), a special assessment of $100, and two years supervised release.

Gonzalez timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  ANALYSIS

### A.  Sufficiency of Evidence

[1] Gonzalez's sufficiency-of-evidence challenge is easily rejected, as it rests on the demonstrably erroneous premise that none of the videotaped depositions that formed the backbone of the prosecution's case was properly admitted into evidence. The record flatly contradicts Gonzalez's claim: the trial minutes and the transcript of the trial reveal that all three tapes were admitted. Gonzalez does not argue, nor could he plausibly, that the videotaped depositions themselves did not provide sufficient evidence to sustain his conviction. Gonzalez's sufficiency-of-evidence challenge must fail.

## B.  Evidentiary Error

Gonzalez argues that the admission of testimony about the heat stroke suffered by the two girls violated several provisions of the Federal Rules of Evidence. Because we conclude that the evidence should have been excluded under Rule 403, which prohibits evidence whose "probative value is substantially outweighed by the danger of unfair prejudice," we need not discuss the other rules Gonzalez cites. However, because we determine that the admission of the unduly prejudicial testimony was harmless, we affirm Gonzalez's conviction.

### 1.  Rule 403

[2] A trial court's determination that the prejudicial effect of particular evidence did not substantially outweigh its probative value under Federal Rule of Evidence 403 is reviewed for an abuse of discretion. *United States v. Plancarte-Alvarez*, 366 F.3d 1058, 1062 (9th Cir. 2004). (As to a criminal defendant, "unfair prejudice" refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). In other words, unfairly prejudicial evidence is that having "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (citation and internal quotation marks omitted).

[3] The probative value of evidence against a defendant is low where the evidence does not go to an element of the charge. *See United States v. Ellis*, 147 F.3d 1131, 1135 (9th Cir. 1998); *United States v. Arambula-Ruiz*, 987 F.2d 599, 604-05 (9th Cir. 1993). In this case, the government charged Gonzalez with violating 8 U.S.C. § 1324(a)(1)(A)(i), a crime with the following elements:

> First, the defendant brought a person who was an alien into the United States at a place other than a

designated port of entry or at a place other than as designated by a United States immigration official;

Second, the defendant knew that the person was an alien; and

Third, the defendant acted with the intent to violate the United States immigration laws by assisting that person to enter the United States at a time or place other than as designated by a United States immigration official or to otherwise elude United States immigration officials.

Ninth Circuit Model Criminal Jury Instructions 9.1 (2003). As a logical matter, the fact that two girls in Gonzalez's group suffered heat stroke does not affect the probability (1) that Gonzalez brought aliens into the United States other than at a recognized port of entry, (2) that Gonzalez knew they were aliens, or (3) that Gonzalez intended to violate U.S. immigration law by bringing them in. The heat stroke is a mere detail in the story of the offense. The district court specifically ruled that the indictment's reference to the girls' injuries was surplusage because it was an issue relevant to sentencing rather than an element of the offense. We agree. Because testimony about the girls' heat stroke does not go to any of the elements of the crime with which Gonzalez was charged, we must consider its probative value low. *Ellis*, 147 F.3d at 1135; *Arambula-Ruiz*, 987 F.2d at 604-05.

[4] "Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). Though the prosecution did not devote a great deal of time to the girls' heat stroke, the testimony presented certainly could have prejudiced Gonzalez unfairly. The border agent's description of the young age and dire condition of the two girls — both of whom needed to be flown to a hospital

and one of whom required resuscitation by rescue breathing — very well could have triggered an emotional response from the jury members, who were likely to be sympathetic to the girls and consequently want to punish the man who caused their heat stroke by bringing them into the desert with insufficient water. Moreover, the prosecution's closing argument drove home to the jury the connection, implicit from the testimony, between the actions of Gonzalez and the injuries to the girls:

> [T]he defendant is the one who told the members of the group how much water to bring to try to walk across 25 miles of desert in the summer heat in Arizona. That was perhaps the second most important decision they would have to make other than who was going to lead them: how much water. You can't survive without water. And the defendant, as the leader of the group, told them how much water they would need. He was wrong, but he's the one who told them how much to bring.
>
> . . .
>
> There were people in distress. He was responsible.

We therefore find at least a "modest likelihood of unfair prejudice." *Hitt*, 981 F.2d at 424.

**[5]** The evidence about the two girls' heat stroke therefore had "an undue tendency to suggest decision on an improper basis." *Old Chief*, 519 U.S. at 180 (citation and internal quotation marks omitted). The likelihood of unfair prejudice was high enough to outweigh the minimal proabative value of this evidence; therefore its admission was an abuse of discretion under Rule 403.

*2.   Harmless Error*

Where we discover an error not of constitutional magnitude, "[w]e must reverse unless there is a 'fair assurance' of harmlessness or, stated otherwise, unless it is more probable than not that the error did not materially affect the verdict." *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc) (citation omitted). The burden to show the harmlessness of the error is on the government, and in the rare case in which we find ourselves in equipoise as to the harmlessness of the error, reversal is required. *See United States v. Seschillie*, 310 F.3d 1208, 1214-16 (9th Cir. 2002).[3]

---

[3]In spite of our en banc decision in *Morales*, we find in our case law a handful of stray passages reciting the harmless-error rule in an inartful fashion that reverses the presumptions delineated in *Morales* by *conditioning* reversal on a showing that the non-constitutional error more likely than not *affected the verdict* rather than *requiring* reversal *unless* the error more likely than not *did not affect the verdict*. *See, e.g., United States v. Verduzco*, 373 F.3d 1022, 1032 n.6 (9th Cir. 2004); *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004). Similar distortions have plagued our precedents concerning harmless error in the civil context. *See Obrey v. Johnson*, 400 F.3d 691, 699 (9th Cir. 2005) (observing that "[i]n a somewhat contradictory fashion, . . . we have formulated two variations of the test for prejudice in civil cases").

Fortunately, two fairly recent opinions, one in the criminal context and one in the civil context, have thoughtfully considered the nature of the harmless-error inquiry and confirmed that an error presumptively requires reversal and the burden is on the government to demonstrate otherwise by showing that the error was more probably than not harmless. *See Obrey*, 400 F.3d at 699-701; *Seschillie*, 310 F.3d at 1214-16. In light of the extensive consideration and forceful answers these decisions have given to the harmless-error question, we feel we are on safe ground in adhering to the position set forth by our en banc court in *Morales* (and generally followed in our case law) and treating as inadvertent the contrary formulations set out in the following cases since *Morales*: *United States v. Bussell*, Nos. 02-50495 & 02-50528, 2005 WL 1620313, at *9 (9th Cir. July 12, 2005); *Verduzco*, 373 F.3d at 1032 n.6; *Pang*, 362 F.3d at 1192; *United States v. Hanna*, 293 F.3d 1080, 1085 (9th Cir. 2002); *United States v. Nguyen*, 284 F.3d 1086, 1089 (9th Cir. 2002); *United States v. Angwin*, 271 F.3d 786, 798 (9th Cir. 2001); *United States v. Jimenez Recio*, 258 F.3d 1069, 1087 (9th Cir. 2001); *United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir. 2000) (per curiam); *United States v. Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000); *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000); *United States v. Hanley*, 190 F.3d 1017, 1028 (9th Cir. 1999); *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir. 1999).

**[6]** In this case, the government advances no argument that the evidentiary error was harmless.**⁴** Usually when the government fails to argue harmlessness, we deem the issue waived and do not consider the harmlessness of any errors we find. *See, e.g., United States v. Varela-Rivera*, 279 F.3d 1174, 1180 (9th Cir. 2002); *United States v. Vallejo*, 237 F.3d 1008, 1026 (9th Cir. 2001), *amended by* 246 F.3d 1150. This approach makes perfect sense in light of the nature of the harmless-error inquiry: it is the government's burden to establish harmlessness, and it cannot expect us to shoulder that burden for it.

**[7]** However, we recognize that no interest is served — and substantial time and resources are wasted — by reversal in those unusual cases in which the harmlessness of any error is clear beyond serious debate and further proceedings are certain to replicate the original result. Fortunately, our precedents do not foreclose the position that an appellate court's sua sponte consideration of harmless error is appropriate on occasions of this type.

**[8]** Several of our sister circuits have developed a useful approach for identifying those extraordinary cases in which an appellate court should sua sponte consider the harmlessness of an error it has identified. In an order denying a petition for rehearing in *United States v. Giovannetti*, 928 F.2d 225 (7th Cir. 1991) (per curiam order), the Seventh Circuit considered the harmless-error waiver question in some detail. The court recognized that requiring courts to consider harmless error even where the government has not argued it would be burdensome to reviewing courts, which would be obligated to search through large records without guidance from the par-

---

**⁴**Although the government mentions that a harmless error analysis applies, it makes no argument on this score nor advances any theory about how any errors here were harmless. "Issues raised in a brief which are not supported by argument are deemed abandoned." *Kohler v. Inter-Tel Technologies*, 244 F.3d 1167, 1182 (9th Cir. 2001).

ties, and could encourage "salami tactics" by the government, which could focus its initial briefing exclusively on whether error has occurred and if it loses, petition for rehearing on the basis of harmless error. *Id.* at 226. However, the court also took note of the potential costs to third parties and to the system brought about by needless relitigation of cases in which the error did not make any difference. *Id.* at 226-27. Balancing these considerations, the court adopted the following rule: "[W]e have discretion to overlook a failure to argue harmlessness, and in deciding whether to exercise that discretion the controlling considerations are the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court." *Id.* at 227. Several circuits have followed or approvingly cited *Giovannetti. See United States v. Torres-Ortega*, 184 F.3d 1128, 1136 (10th Cir. 1999); *United States v. McLaughlin*, 126 F.3d 130, 135 (3d Cir. 1997); *United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir. 1997); *Horsley v. Alabama*, 45 F.3d 1486, 1492 n.10 (11th Cir. 1995); *Lufkins v. Leapley*, 965 F.2d 1477, 1481-82 (8th Cir. 1992); *United States v. Pryce*, 938 F.2d 1343, 1347-48 (D.C. Cir. 1991) (opinion of Williams, J., announcing the judgment of the panel); *see also United States v. Dolah*, 245 F.3d 98, 107 (2d Cir. 2001) ("We have discretion to consider the harmlessness of an alleged error even though the Government has not argued this line of defense."), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 64 (2004); *cf. United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1142-43 (9th Cir. 2005) (Berzon, J., dissenting in part) (touting the *Giovannetti* approach while noting that the Ninth Circuit has yet to consider it).

**[9]** We find the Seventh Circuit's analysis persuasive, and we agree that the government's failure to argue that an error is harmless does not categorically preclude our consideration of that question. We also find helpful the three factors — the length and complexity of the record, whether the harmless-

ness of an error is certain or debatable, and the futility and costliness of reversal and further litigation — that the Seventh Circuit considers in determining when it is appropriate to recognize an error's harmlessness notwithstanding the government's failure to argue it. At the same time, we are particularly sensitive to the Seventh Circuit's concerns that sua sponte consideration of harmlessness will often burden reviewing courts and give the government too many chances to argue harmless error. Even more troubling, the practice may unfairly tilt the scales of justice by authorizing courts to construct the government's best arguments for it without providing the defendant with a chance to respond. *See, e.g.*, *Stuard v. Stewart*, 401 F.3d 1064, 1067 (9th Cir. 2005).

[10] Mindful of these risks, we believe that while all three *Giovannetti* factors are relevant to a court's determination of whether to engage in harmless-error review on its own initiative, the second factor — the court's certainty as to the harmlessness of the error — is of particular importance. *See Rodriguez-Preciado*, 399 F.3d at 1143 (Berzon, J., dissenting in part) ("[T]he touchstone of whether courts should reach harmless error sua sponte is the extent to which the harmlessness of the error is open to question."); *Pryce*, 938 F.2d at 1348 (opinion of Williams, J., announcing the judgment of the panel) ("Where the government does *not* raise the harmless error issue, I would deem errors 'harmless' only where satisfaction of that standard is beyond serious debate." (emphasis in original)); *cf. Lufkins*, 965 F.2d at 1482 (recognizing harmless error sua sponte where "the finding of harmlessness is beyond reasonable argument"). If the harmlessness of the error is at all debatable, prudence and fairness to the defendant counsel against deeming that error harmless without the benefit of the parties' debate. We agree with the observation of our colleague from the D.C. Circuit that "where the case is at all close, defense counsel's lack of opportunity to answer potential harmless error arguments may lead the court to miss an angle that would have shown the error to have been prejudicial." *Pryce*, 938 F.2d at 1347 (opinion of Williams, J.,

announcing the judgment of the panel). We therefore conclude that sua sponte recognition of an error's harmlessness is appropriate *only* where the harmlessness of the error is not reasonably debatable. Since we find this condition satisfied in Gonzalez's case, we hold that the evidentiary error we have identified was harmless and affirm the conviction.

**[11]** The record here is small and simple, and we have no difficulty concluding that allowing the jury to hear testimony about the girls' heat stroke was undeniably harmless and that reversal and further litigation would be futile. Gonzalez's trial lasted less than two days, and the evidence against him was overwhelming. Three witnesses who were part of the group Gonzalez led across the desert testified that Gonzalez did exactly what he was charged with doing. The elements of the crime were easily established. Gonzalez put on no defense.

**[12]** We have no doubt that the jury would have convicted Gonzalez notwithstanding the unduly prejudicial evidence pertaining to the girls' heat stroke. The record here does not merely provide a " 'fair assurance' of harmlessness," *Morales*, 108 F.3d at 1040 (citation omitted); it leads us inexorably to the conclusion that the error's harmlessness is beyond serious debate. If we were to send this case back for retrial, the government would play the same videotaped depositions for the jury, and the jury would reach the same verdict. We therefore hold that the admission of testimony concerning the heat stroke was harmless, and we affirm Gonzalez's conviction.

## C. Sentencing Issues

Gonzalez also claims his sentence is unconstitutional under *United States v. Booker*, 125 S. Ct. 738 (2005). Here, Gonzalez received three sentence enhancements based on facts found by the judge under a standard less than beyond a reasonable doubt. These facts were: (1) the number of aliens smuggled; (2) the fact that Gonzalez brought people into the desert with insufficient water, thereby recklessly creating a

substantial risk of death or serious bodily injury; and (3) the fact that the two girls suffered severe heat distress, which constituted serious bodily injury sustained in connection with the offense.

The government claims that Gonzalez waived his Sixth Amendment rights because the government offered to present the fact of the heat stroke to the jury and Gonzalez's lawyer rejected this offer by urging the court to strike the matter from the indictment in an (ultimately unsuccessful) attempt to keep the girls' heat stroke away from the jury. The government misapprehends the strict standards for waiver of constitutional rights generally and for the waiver of the jury trial right in particular.

We have recently summarized the principles governing the waiver of constitutional rights:

> Waiver is the intentional relinquishment or abandonment of a known right. Courts indulge every reasonable presumption against waiver of fundamental constitutional rights and do not presume acquiescence in the loss of fundamental rights. Therefore, presuming waiver from a silent record is impermissible.

*United States v. Hamilton*, 391 F.3d 1066, 1071 (9th Cir. 2004) (citations, internal quotation marks and source's alteration marks omitted).

**[13]** In particular, we have held that "[t]he right to a jury trial may only be waived if the following four conditions are met: (1) the waiver is in writing; (2) the government consents; (3) the court accepts the waiver; and (4) the waiver is made voluntarily, knowingly, and intelligently." *United States v. Duarte-Higareda*, 113 F.3d 1000, 1002 (9th Cir. 1997). To ensure that a waiver is voluntary, knowing, and intelligent, the district court should:

> inform the defendant that (1) twelve members of the community compose a jury, (2) the defendant may take part in jury selection, (3) a jury verdict must be unanimous, and (4) the court alone decides guilt or innocence if the defendant waives a jury trial. Furthermore, the district court should question the defendant to ascertain whether the defendant understands the benefits and burdens of a jury trial and freely chooses to waive a jury.

*Id.* (citation omitted). Though we have declined "to impose an absolute requirement of such a colloquy in every case," *id.* at 1003, in its absence we will find a valid waiver of the jury trial right only where there are strong indicia that the waiver was voluntary, knowing, and intelligent. *See, e.g.*, *United States v. Cochran*, 770 F.2d 850, 851 (9th Cir. 1985) (finding waiver of the jury trial right where the defendant discussed the matter with his lawyer, told the court he wished to waive the right, and executed a written waiver in the presence of the court).

**[14]** Such indicia are wholly absent from Gonzalez's case. The record provides no indication that Gonzalez himself had considered the nature of the right the government claims his lawyer waived, or had any idea that his lawyer was waiving it, much less demonstrated an actual intent to abandon this right. Gonzalez himself was entirely silent while his counsel sought to exclude the fact of the two girls' heat stroke from the indictment — the act that the government contends amounted to a waiver of the jury trial right. We will not presume waiver from a silent record. *Hamilton*, 391 F.3d at 1071. Nor will we presume the waiver of one right based on the assertion of another. *See Hays v. Arave*, 977 F.2d 475, 477-78 (9th Cir. 1992), *overruled on other grounds*, *Rice v. Wood*, 77 F.3d 1138, 1144 n.8 (9th Cir. 1996) (en banc). In the absence of strong indicia that Gonzalez voluntarily, knowingly, and intelligently waived his jury trial right, he is entitled to the full

range of Sixth Amendment protection guaranteed under *United States v. Booker*.[5]

**[15]** Because Gonzalez's sentence was enhanced under a mandatory-guideline regime based on facts not admitted by him or proved to a jury beyond a reasonable doubt, his Sixth Amendment right to a jury trial was violated. *Booker*, 125 S. Ct. at 749-50. Although Gonzalez did not waive this right, he did not raise the Sixth Amendment objection at sentencing. We review unpreserved *Booker* violations for plain error. *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc). Here, though there was error, and it was plain, the third prong of the plain-error inquiry — whether the error affected Gonzalez's "substantial rights" — is in doubt, because "it is not possible to reliably determine from the record whether the sentence imposed would have been materially different had the district court known that the Guidelines were advisory." *Id.* at 1084. Therefore, in accordance with *United States v. Ameline*, we remand so that the district court may answer this question and, if necessary, resentence Gonzalez in a manner consistent with *Booker* and *Ameline*. *See id.* at 1084-85. Gonzalez may, of course, opt out of such resentencing by promptly notifying the district court of his desire to do so. *Id.* at 1084.

## III.   CONCLUSION

The evidence was sufficient to support the conviction. Testimony pertaining to the heat stroke suffered by two members of the party Gonzalez led across the desert was unduly preju-

---

[5]Our analysis of the waiver question is unaffected by our recent decision in *United States v. Cardenas*, 405 F.3d 1046 (9th Cir. 2005), in which we rejected a defendant's claim that his waiver of the right to appeal his sentence was rendered involuntary and unknowing by the Supreme Court's subsequent decision in *Booker*. *Id.* at 1048. Gonzalez's claim is not that the change in law retroactively undermined the voluntariness of an otherwise-effective waiver; rather, he claims that he did not intend to waive any right to begin with.

dicial, and the district court abused its discretion by admitting it. However, from our review of this uncomplicated record, we find it to be beyond debate that the error was harmless and that reversal and retrial would be futile. Therefore we affirm Gonzalez's conviction.

Gonzalez did not waive his Sixth Amendment rights when his lawyer tried to keep evidence of the heat stroke away from his jury. Although Gonzalez was sentenced in violation of the Sixth Amendment, he did not object in the district court and therefore we review for plain error. Because we cannot answer the plain error question on this record, we remand in accordance with *United States v. Ameline*.

**AFFIRMED IN PART; REMANDED.**