# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

GARTH KLOEHN,
           *Defendant-Appellant.*

No. 06-50456

D.C. No.
CR-03-00912-1-DSF

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

GARTH KLOEHN,
           *Defendant-Appellant.*

No. 07-50274

D.C. No.
CR-03-00912-D
SF-01

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
December 7, 2009—Pasadena, California

Filed August 30, 2010

Before: Stephen Reinhardt, Stephen S. Trott and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Trott

12957

**COUNSEL**

Thomas P. O'Brien, United States Attorney; Christine C. Ewell, Assistant United States Attorney, Chief, Criminal Division; Ruth C. Pinkel, Assistant United States Attorney, Major Frauds Section; Michael J. Raphael, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

David A. Katz, Beverly Hills, California, for the defendant-apellant.

## OPINION

REINHARDT, Circuit Judge:

Garth Kloehn appeals from his conviction and sentence for four counts of causing tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2. We hold that the district court abused its discretion and prejudiced Kloehn's ability to present his defense when it refused to continue the trial for two days to allow him to see his dying son. Accordingly, we reverse and remand for a new trial. We do not reach Kloehn's other arguments on appeal.

I.

Garth Kloehn was indicted on tax evasion charges on September 9, 2003. His first trial ended in a mistrial on March 1, 2005, when the jury could not agree on a verdict. His second trial, on a redacted indictment, began in Los Angeles, California on November 15, 2005. Kloehn himself was the sole defense witness. On the evening of the fifth day of his testimony, his son Kevin suffered a "massive seizure" in Las Vegas where Kloehn and his son both lived. Kevin had previously been diagnosed with end-stage melanoma. Following the seizure, the emergency room doctor reported to Kloehn that Kevin "ha[d] very little life expectancy" and was expected to die in the "next few days." He also provided him with a note to that same effect.

The following day, Kloehn was set to resume testifying in his own defense. Prior to the start of the day's proceedings, defense counsel requested a two-day continuance to allow Kloehn to see Kevin once more before his death. Counsel submitted the note from the emergency room doctor documenting the gravity of the situation. He explained that Kloehn had been unable to concentrate the night before, making it extremely difficult to prepare his testimony, and said that he

doubted that Kloehn would be able to testify effectively that day.

The government opposed Kloehn's request for a continuance. The government's attorney suggested that if he wanted to be with his son, he could just "finish his testimony, and . . . go back to Las Vegas." She argued that "[a] break would operate . . . to the significant detriment of the jury's ability to even remember what happened during the course of the trial."

The district judge did not question the reliability of the doctor's note or the gravity of the situation. She did not make any finding that a short continuance would inconvenience either the court or the government. Nonetheless, she denied the continuance.

Kloehn then took the stand and testified for several hours, after which the defense rested.[1] The government's one rebuttal witness, an IRS agent, took the stand and began to summarize the flow of money involved in the case. Shortly after she began testifying, defense counsel requested permission to approach the bench. He observed that it did not appear that the agent would complete her testimony that day, and requested that trial be concluded for the day so that Kloehn could catch a plane to Las Vegas to see his son. The court agreed to end proceedings for the day and to "excuse" Kloehn from the rest of the trial. Defense counsel agreed that Kloehn would "waive his appearance."[2] Kloehn left for Las Vegas. His son died about an hour after he arrived.

---

[1]Kloehn's testimony spans approximately 150 pages of transcript.

[2]Before the start of the first trial, Kloehn signed a document entitled "Waiver of Defendant's Presence." *See* Federal Rule of Criminal Procedure 43 (providing that a criminal defendant who is voluntarily absent from his trial waives his right to be present). The document stated that he "waived his right to be present in open court . . . before during, or after trial" and requested the court "to proceed during every absence of his which the court may permit . . . ." Kloehn had relied on the waiver to be absent one day during his first trial. He did not sign a similar document prior to the second trial and, prior to his son's seizure, he had been present for every day of that trial.

Kloehn did not appear in court the following day. Defense counsel conveyed to the court the news about Kevin's death. The judge offered her condolences, and asked counsel what he would like the court to say to the jury about Kloehn's absence. Counsel requested that the judge inform the jury that Kloehn had been excused due to a death in the family. The judge responded, "[f]amily emergency is fine." The government attorney then argued that the judge should simply tell the jury that "the defendant has chosen not to be here." Defense counsel opposed the government's proffered explanation on the ground that it would encourage the jury to think that Kloehn was showing a lack of respect for the court.

When the jurors entered, the district judge addressed them as follows:

> Ladies and gentlemen, you may notice that Mr. Kloehn is not here. He is unable to be with us today. He has a right to be present. He has a right not to be present. He is not required to be here, so you shouldn't infer anything from the fact that he is not able to be here today.

The next day, after five hours of deliberations, the jury found Kloehn guilty on four counts of tax evasion.

## II.

A district court has "broad discretion" to grant or deny a continuance. *United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir. 1985). Its decision "will not be disturbed on appeal absent clear abuse of that discretion." *Id.* A district court abuses its discretion if its denial of a continuance is "arbitrary or unreasonable." *Id.*

Kloehn argues that the district court's denial of a continuance in this case was arbitrary and unreasonable. "There are no mechanical tests for deciding when a denial of a continu-

ance is so arbitrary as to violate due process." *Ungar v. Sara-fite*, 376 U.S. 575, 589 (1964). Rather, "[t]he answer must be found in the circumstances present in every case . . . ." *Id.; see also Armant v. Marquez,* 772 F.2d 552, 556 (9th Cir. 1985) (explaining that whether a district court abused its discretion in denying a continuance is a "case-by-case inquiry . . . bound by no particular mechanical test"). In assessing Kloehn's claim, however, we are guided by the four-factor inquiry set forth in *United States v. Flynt. See* 756 F.2d at 1358-62.

**[1]** Pursuant to *Flynt*, we first ask whether Kloehn was diligent in preparing his defense or whether his request for a continuance appears to be a delaying tactic. *Id.* at 1359. Second, we inquire into the usefulness of the continuance, asking how likely it was that the purpose of the continuance would have been achieved had it been granted. *Id.* at 1360. Third, we look to "the extent to which granting the continuance would have inconvenienced the court and the opposing party." *Id.* Finally, we inquire whether Kloehn was prejudiced by the denial. *Id.* at 1361. "[T]he weight given to any one [of the *Flynt* factors] may vary from case to case." *Armant*, 772 F.2d at 556. "At a minimum, however, in order to succeed, [Kloehn] must show some prejudice resulting from the court's denial." *Id.* at 557.

**[2]** The first *Flynt* factor weighs heavily in Kloehn's favor. There is no question that he was diligent. He requested a continuance at the first opportunity after Kevin's seizure. There is no suggestion that his request was made for the purpose of delay. Neither the district court nor the government have even hinted that his motivation in requesting the continuance was anything other than it appeared to be: a father's desire to be with his son on his deathbed.

**[3]** The second *Flynt* factor is whether the continuance would have served its stated purpose. Had the continuance been granted, it would have permitted Kloehn to be with his

son on the last day of his son's life. It also would have relieved Kloehn of the immense pressure of testifying with the knowledge that his son was on the brink of death, aware that he had to complete his testimony before he could see him one last time. Finally, it would have allowed Kloehn to be present for the end of his trial, preventing the impression that he simply chose to be absent without cause, along with the resulting myriad negative inferences the jury might have drawn therefrom. Nonetheless, the district court evidently doubted the utility of the continuance. In denying Kloehn's request, the district judge stated:

> I do accept that the situation for Kevin Kloehn is very dire, and it's very unfortunate that the matter was continued this long. Frankly, this is the way things go. You continue things, and the situation gets worse, not better.

We understand this statement to refer to the fact that the start of trial had previously been continued at Kloehn's request, from September 27, 2005 to November 15, 2005.

**[4]** The September continuance was requested by Kloehn and granted by the court primarily on the ground that the government had made substantial changes to the trial indictment, as a result of which the defense needed extra time to prepare for trial. In his request for the continuance, Kloehn listed the fact that Kevin was beginning chemotherapy as one of 12 subsidiary justifications for delaying the trial's start date. It is true that, with respect to Kevin's health, the September continuance resulted in the trial proceeding at a time when the situation was "worse, not better." But that was no reason to doubt the veracity of the emergency room doctor's statement on December 6, 2005 that Kevin's death was imminent, nor did the earlier continuance provide any reason why it would have been fruitless to continue the trial for one or two days to allow Kloehn to say a final goodbye to his son. To the contrary, the benefit that the requested continuance would have

had for Kloehn is immeasurable. Accordingly, we conclude that the second *Flynt* factor weighs overwhelmingly in Kloehn's favor.

[5] The third *Flynt* factor is "the extent to which granting the continuance would have inconvenienced the court and the opposing party." *Flynt*, 756 F.2d at 1360. As stated above, the district court made no finding that a continuance would have inconvenienced the government or the court. The government's only proffered reason for opposing a continuance — other than its bald assertion that the trial "ha[d] gone on far too long as it is" — was its contention that the jurors would be unable to remember the evidence following a short continuance. This contention is wholly meritless and we doubt that it was made in good faith. Were it true, it would call into question the reliability of jury verdicts in any lengthy trial, including the government's many complex drug prosecutions. We observe that the trial had previously recessed for five days over the Thanksgiving holiday, and that, every weekend, the court recessed for three days; there is no indication that the jurors experienced any difficulty in resuming their role in the trial following these longer recesses, or that the government believed that their memories were impaired. We find the government's explanation of the reasons it opposed the continuance extremely disturbing. We also find it highly disturbing that a father would be denied a continuance that would have allowed him to be present at his son's deathbed when granting a continuance would have caused, *at most*, the slightest of inconveniences to the court and to the government. We thus conclude that the third *Flynt* factor also weighs overwhelmingly in Kloehn's favor.

[6] Finally, we turn to the question of prejudice. In *United States v. Mejia*, 69 F.3d 309, 316-19, 318 n.11 (9th Cir. 1995), we described the required showing of prejudice in cases in which a defendant alleges that the denial of a continuance affected his ability to present evidence. We explained that, in such cases, the prejudice standard is "less stringent"

than the " 'clearest showing' of 'actual and substantial prejudice' " standard that we apply in cases in which a defendant alleges that the denial of a continuance prevented him from obtaining discovery. *Id.* at 318 n.11. We further explained that the focus of our prejudice inquiry is the "extent to which the aggrieved party's right to present his defense has been affected." *Id.*

Applying that prejudice standard, we held that Mejia had been prejudiced by the district court's decision to rely on a transcript of two witnesses' testimony in ruling on his motion to suppress, rather than to continue the trial for one day so that the witnesses could appear to testify in person. *Id.* The witnesses' story differed from that of the defendant, and resolution of the motion to suppress depended on who the court found to be more credible. We observed that the "demeanor and tone of voice" of the witnesses was "critical to [a] credibility determination[ ]" and determined that the judge's choice to proceed without that "critical" information constituted "substantial prejudice" to the defendant. *Id.*

[7] In this case, Kloehn asserts that the district court's denial of a continuance affected his ability to testify in his own defense. He contends that his overwhelming concern about his son's condition prevented him from preparing his testimony the night before the final day on which he was to testify, and left him distracted and unable to concentrate during the testimony itself. As we recognized in *Mejia*, "demeanor and tone of voice" is "critical to [a] credibility determination[ ]." 69 F.3d at 316-19. We find it self-evident that an individual's demeanor would be affected by the knowledge that his son was on the brink of death.[3] Kloehn's

---

[3]The district court found that "[a]lthough Mr. Kloehn was clearly troubled by his son's state of health, he had no trouble testifying during his counsel's direct examination." The district court made no similar finding, however, regarding Kloehn's testimony on redirect, which is the testimony at issue here.

defense hinged on whether the jury believed his testimony that he had acted in good faith reliance on the advice of his attorneys and accountants. Accordingly, his testimony and his credibility were important. The denial of a continuance under these circumstances was necessarily prejudicial.

This is particularly true because during re-cross examination on the day in question, the government launched an attack on Kloehn's credibility along unexpected and highly damaging lines. It introduced evidence that Kloehn's firm, Kloehn Co., had paid the rent of a female Kloehn Co. employee, and sought to show that the employee was Kloehn's mistress and that the company's rent payments evidenced Kloehn's improper use of company funds for personal expenses. After Kloehn confirmed that Kloehn Co. had paid rent for the employee in question, the prosecutor asked, "You had a personal relationship with [this woman]?" Kloehn responded, "Yes." The prosecutor then asked, "You had the type of relationship with [this woman] that didn't make your wife very happy when she found out about it?" Kloehn responded, "Yes. She was — she kind of raised heck, yes."

The district court allowed this line of testimony on the ground that it was relevant to impeaching Kloehn's testimony on re-direct that he had not used company funds for personal expenses. But the government's questioning and Kloehn's responses implicated Kloehn's credibility in a broader sense, by providing the jury with evidence that Kloehn had been unfaithful to his wife and was not of good moral character. Although admissible, the testimony concerned a highly sensitive subject and Kloehn's manner and demeanor in responding to the questions was important.

[8] Finally, we agree with Kloehn that the vague explanation offered by the court to explain to the jury his absence on the day following his son's death exacerbated the prejudice resulting from the denial of a continuance. In explaining Kloehn's absence to the jury, the court stated:

> Ladies and gentlemen, you may notice that Mr. Kloehn is not here. He is unable to be with us today. He has a right to be present. He has a right not to be present. He is not required to be here, so you shouldn't infer anything from the fact that he is not able to be here today.

By offering that explanation, rather than the "family emergency" explanation that the judge herself initially stated that she would give, but changed when the prosecution objected, the judge gave the jurors the impression that Kloehn could well be callously uninterested in his own trial. Even worse, the jury could infer that Kloehn believed he would be found guilty, and had other, more important things to do than observe trial.

**[9]** Because each of the four *Flynt* factors weigh strongly in Kloehn's favor — the first three overwhelmingly — we conclude that the district court's denial of a continuance was manifestly unreasonable. An arbitrary denial of a continuance is subject to the harmless error test. *See United States v. Barrett*, 703 F.2d 1076, 1081-82 (9th Cir. 1983) (applying harmless error analysis to arbitrary denial of a continuance); *United States v. Gonzalez-Flores,* 418 F.3d 1093, 1099 (9th Cir. 2005) (stating that a non-constitutional error requires reversal unless the error is shown to be harmless). Here, because the error is non-constitutional, in order to prove harmlessness the government would be required to show that the error more probably than not did not affect the verdict.[4] *Gonzalez-Flores,* 418 F.3d at 1099.

---

[4]The dissent repeatedly asserts that the district court's denial of the continuance did not rise to the level of constitutional error. But we have not suggested that it did. Our decision has nothing to do with Kloehn's Due Process right to be present at trial. Nor does it rely on Kloehn's Sixth Amendment right to confront witnesses. The dissent's discussion of those issues in no way contradicts our conclusion that the district court abused its discretion by denying Kloehn's request for a continuance.

In this case, however, the government has not contended that the error was harmless. As a general rule, "when the government fails to argue harmlessness, we deem the issue waived and do not consider the harmlessness of any errors we find."[5] *Id.* at 1100; *see also United States v. Varela-Rivera*, 279 F.3d 1174, 1180 (9th Cir. 2002) (holding that the government waived any harmless error argument by failing to raise the issue of harmlessness); *United States v. Vallejo*, 237 F.3d 1008, 1026 (9th Cir. 2001) (same).

We do have discretion to consider the issue of harmlessness *nostra sponte* in "extraordinary cases." *Gonzalez-Flores,* 418 F.3d at 1100-1101. This case is not, however, the "extraordinary" one in which it is appropriate to consider harmlessness even though the issue has not been raised and there has been no briefing on the question by either party. We have concluded that the "length and complexity of the record" is a factor that weighs against *nostra sponte* consideration of harmlessness. *Id.* This case involves a lengthy and complex record, including voluminous transcripts, which render the harmlessness inquiry a "burdensome" one. *Id.* Were we to take up this inquiry on our own, we "would be obligated to search through large records without guidance from the parties" with the likely result of "unfairly tilt[ing] the scales of justice . . . [in the government's favor] by constructing [its] best arguments for it without providing the defendant with a chance to respond." *Id.* at 1101. Further, we have stated that our *nostra sponte* consideration of harmlessness is not appropriate if "the case is at all close." *Id.* (internal quotation marks removed). Kloehn's first trial ended with the jury hung seven to five. The government prosecuted Kloehn at that trial on all four counts on which he was convicted here, and the jury

---

[5]Although the dissent consists almost entirely of a discussion of harmlessness, Judge Trott fails even to acknowledge that the government has waived the issue, much less to offer an explanation of why this is an appropriate case in which to make an exception to the general rule that issues not raised by the parties are waived.

hung on all four following a lengthy trial. At the first trial at least, the government's case against him was close. We cannot say without a burdensome review of the record that at the second trial it wasn't as well. For these reasons, this is not an appropriate case in which to exercise our discretion to consider the issue of harmlessness *nostra sponte*. Moreover, we find the government's behavior with respect to the continuance regrettable. We are not now inclined to "tilt the scales of justice" in its favor.[6] *Id.*

**[10]** We hold that the district court abused its discretion in denying Kloehn's request for a continuance. The government has not contended that this error was harmless, and has thus waived the issue. Accordingly, we REVERSE and REMAND for a new trial.

REVERSED and REMANDED.

---

TROTT, Senior Circuit Judge, dissenting:

Even were I to start from the assumption that Judge Fischer's denial of a continuance to Kloehn in connection with Kloehn's son's dire medical condition was an abuse of discretion, I am unable to join in Judge Reinhardt's opinion. Why? The error, if any, was demonstrably harmless.

Judge Fischer's decision possibly implicates two constitutional rights, neither of which Kloehn explicitly referenced in the district court. The first right is the Due Process right "to be present from the time the jury is impaneled until its discharge after rendering the verdict." *Shields v. United States*,

---

[6]We recognize that in *Gonzalez-Flores* we also said that we would consider the "costliness of reversal and further litigation." 418 F.3d at 1101. That, however, is far from enough to persuade us to change our ruling in this case.

273 U.S. 583, 589 (1927); *see also Kentucky v. Stincer*, 482 U.S. 730, 745-48 (1987). This right, however, is not absolute or "structural," and if violated, it is subject to the harmless error rule. *Stincer*, 482 U.S. at 745-47 (defendant excluded from a pre-trial competency hearing regarding child witnesses against him); *Rushen v. Spain*, 464 U.S. 114, 117-18 (1983) (defendant not present at conversations during the trial between a juror and the judge regarding the juror's ability to be impartial); *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934) (defendant excluded from the jury's silent visit to the scene of the crime), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964); *Rice v. Wood*, 77 F.3d 1138, 1141-45 (9th Cir. 1996) (en banc) (defendant's absence during jury's pronouncement of sentence after a finding of guilt subject to harmless-error analysis); *Hegler v. Borg*, 50 F.3d 1472, 1477 (9th Cir. 1995) (defendant's absence during a read back for testimony requested by the jury was subject to harmless-error analysis). The key question is whether the defendant's absence from the proceeding impaired the defendant's opportunity to defend himself against the charges; and this issue "should be considered in light of the whole record." *United States v. Gagnon*, 470 U.S. 522, 527 (1985).

The second right is the right guaranteed by the Sixth Amendment's Confrontation Clause to confront witnesses. The purposes of this right are (1) to guarantee the defendant a "face-to-face" meeting with witnesses against him, *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988); and (2) to ensure a defendant an "opportunity for cross examination." *Stincer*, 482 U.S. at 739. A violation of either value of this non-structural right is also subject to harmless-error analysis. *Coy*, 487 U.S. at 1021-22. Kloehn's counsel did not articulate this constitutional concern either.

With these considerations in mind, I cannot identify *any* prejudice or harm to Kloehn that arose from the denial of his motion to continue. Judge Fischer's "error" appears to have been harmless beyond a reasonable doubt in terms of its

actual impact on any of Kloehn's rights protected by the Constitution. *Now*, of course, his counsel claims — with no support whatsoever in the record — that (1) Kloehn's testimony on redirect and re-cross after the denial of the motion and before he left was impaired because Kloehn could not "focus," (2) Kloehn couldn't have his face-to-face confrontation with the remaining 10-minute summary witness, (3) Kloehn's grief interfered with counsel's ability to prepare for jury instructions and argument, and (4) Kloehn could not be there to assist counsel in connection with responding to the government's closing argument. All of these naked claims would be fine and dandy — if they were supported in the record with any evidence at all, either direct or circumstantial, but they aren't. Saying so doesn't make it so, neither does wishful thinking. Among other factors I consider are that this was the *second* trial. Kloehn and his counsel — the same attorney who represents him on appeal — had been over all of this once before, including instructions and argument.

All Kloehn's counsel expressed a specific concern about was the *possibility* that Kloehn's son Michael might be called to the stand by the government, but that did *not* happen. Also, we have a finding of fact by Judge Fischer that Kloehn's testimony was fine — except that he appeared to be lying. I have read every word of his redirect and recross testimony, which occurred after the denial of his motion, and I cannot find a single instance of confusion on Kloehn's part, not one. All I find is a series of grossly leading and repetitive questions by his counsel. Effectively, his counsel narrated and regurgitated the defense, and Kloehn agreed with his narration.

I am influenced by exactly what transpired when the question of a continuance first arose, and as it then developed. As is usually the case, the record tells a different story than counsel's briefs and arguments — which tend to be mostly spin in his client's favor.

First, Judge Fischer was apparently aware of Kloehn's Rule 43 Waiver of Presence on file when she excused him from the

rest of the trial, noting that there was very little of the trial left. The Rule 43 waiver, signed by both his counsel and Kloehn says inter alia,

> The undersigned defendant requests the Court to proceed during every absence of his of which the Court may permit pursuant to this waiver; agrees that his interests will be deemed represented at all times by the presence of his attorney, the same as if the defendant was personally present in court; and further agrees to be present in person in Court ready for trial on any day and hour which the Court may fix in his absence.

Kloehn's counsel did not protest what had just happened. He said ". . . we are in this situation, and we will muddle through." Again, the *only* thing counsel expressed concern about was Kloehn's son Michael, but, as I indicated, Michael did not take the stand.

Did counsel raise an objection that Kloehn was forced by Judge Fischer's adverse ruling to forego his right to a face-to-face meeting with any witness? No. Did counsel protest that somehow his client's absence would interfere with counsel's ability to cross examine any witness? No. Did counsel point to any precise problems with the instructions that Kloehn needed to be present to rectify? No. Did he indicate he needed Kloehn to be present to prepare for or to respond to argument? No. He just rolled with the punch. What he said *after* Kloehn's testimony and after the beginning of the summary witness's testimony was,

> Counsel for Mr. Kloehn:
>     Your Honor, I don't think the government can get done today [with the final summary witness]. And, if Mr. Kloehn left right now, he might be able to catch the 2:45 flight that I mentioned to your

Honor before.

If he can't be here tomorrow morning, *I would waive his appearance*, but it's clear they are going to need . . .

Counsel for the government:
I was not going to be publishing anymore of the underlying exhibits just to try to move it along more quickly.

The Court:
Do you want to just stop?

Counsel for Mr. Kloehn:
Do you mind?

The Court:
Fine.

After a sidebar conference, the court excused the jury, and the court said — clearly in reference to what happened at the unreported sidebar — "I understand Mr. Kloehn is going to waive his appearance hereafter. He is certainly invited to join us at any time, but he is not required to be here. Is there any rule that he has to be here for the verdict?" Counsel responded, "Your Honor, I don't believe so. Depending on how things go, obviously he would like to be. But if they go the other way, his situation really is in extremis." *Why did counsel waive Kloehn's presence if he has real constitutional objections*? Counsel did not say that the waiver was involuntary. Also, on this record, it's not altogether fair to say that Judge Fischer "excluded" Kloehn from anything. The defendant relied on his Rule 43 Waiver and left.

Then, counsel said he had a few jury instructions *he* was still working on, but that they were in his office on his word processor. He did not say a word about needing Kloehn to help him. He asked the court for a recess to retrieve the

instructions, planning to return at 3:30 p.m. *without* going over them with his client. Because of "traffic" he did not return in time, but he did deliver his instructions to the Clerk.

The next day, Day 12 of the trial, the court discussed counsel's proposed additions to the instructions. *At the end* of this discussion, counsel asked to suspend the proceedings for one day, claiming "in view of what happened to Mr. Kloehn . . . it's been extremely hard for the defense to prepare for the closing argument today, for this jury instructions matter and so forth." But, there was no showing whatsoever that this was anything more than one of counsel's many diaphanous claims, without any evidence or substance to back them up. He did not elaborate on his concerns.

The witness whose testimony began while Kloehn was there and finished the next day in his absence was IRS Revenue agent Carol Bennett. Her testimony related only to a "books and records" summary chart (exhibit 1008) that listed the movement in 1993-1994 of money from the Kloehn Company to Exeter in Grand Cayman and then back to Kloehn for the building of Kloehn's facility in Las Vegas. Counsel did not attack anything on the chart. He did not deny that any of the transactions shown on the chart in fact took place. All he did was point out on cross what the chart did *not* show, i.e., Kloehn's (1) knowledge of what was going on, (2) his willfulness or state of mind, (3) any advice he may have received from attorneys, accountants, or other financial professionals:

> Counsel for Mr. Kloehn:
> Now, was — again, I think we covered this, but you are not testifying about any aspect of Mr. Garth Kloehn's knowledge at the time of any of these events; correct?
>
> Witness:   Correct.
>
> Counsel:   Or his willfulness or state of mind?

Witness: Correct.

Counsel: Or what advice he got from attorneys, accountants or other financial professionals; correct?

Witness: Correct.

In summary, nothing the witness said involved Kloehn's state-of-mind defense.

Counsel's final argument to the jury was roughly three hours long. Nowhere does it appear that his defense was affected at all by Kloehn's absence.

Insofar as the merits and the "whole record" weigh in this calculation, *Gagnon*, 470 U.S. at 527, Kloehn was charged with a transparent scam which anyone with an IQ over room temperature would have seen as illegal. The expenses he claimed were spurious, and the tax free laundering back to him was a smoking gun plus a bullet hole in his defense.

Bottom line? Where's the beef? Where's the prejudice? Where's the damage?

I respectfully dissent.