**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 12-10548 |
| | D.C. No. 4:12-cr-00115-JGZ-CRP-1 |
| v. | |
| JOSE ANTONIO LIERA-MORALES, AKA Jose Antonio Liera Morales, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, District Judge, Presiding

Argued and Submitted
March 10, 2014—San Francisco, California

Filed July 21, 2014

Before: J. Clifford Wallace, M. Margaret McKeown,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Criminal Law

The panel affirmed convictions stemming from the defendant's participation in a scheme to kidnap for ransom Franklin Aguilar-Avila, in a case in which the defendant was part of a human-trafficking ring that contacted Aguila-Avila's mother, Sonia Avila, to demand payment for her son's release.

The panel held that the district court's admission of a government agent's testimony recounting Avila's description of the telephone call in which she arranged for the safe return of her son did not violate the Confrontation Clause of the Sixth Amendment because the call was made primarily to address an ongoing emergency and the challenged statements were nontestimonial.

The panel held that even if the Rule of Completeness applies, the district court did not abuse its discretion in admitting a government agent's testimony about portions of the defendant's post-arrest interview but precluding the defendant from introducing exculpatory statements from that interview.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Keith J. Hilzendeger (argued), Federal Public Defender's Office of Phoenix, Phoenix, Arizona, for Defendant-Appellant.

Kyle J. Healey (argued), Assistant United States Attorney; John S. Leonardo, United States Attorney; Robert L. Miskell, Assistant United States Attorney, Appellate Chief, Tucson, Arizona, for Plaintiff-Appellee.

**OPINION**

McKEOWN, Circuit Judge:

Jose Antonio Liera-Morales appeals from the judgment following his jury convictions stemming from his participation in a scheme to kidnap for ransom Franklin Aguilar-Avila ("Aguilar"). Liera-Morales was part of a human-trafficking ring that contacted Aguilar's mother, Sonia Avila, to demand payment for her son's release. Under stressful and emotional circumstances, Avila spoke with the traffickers by telephone to arrange for the safe return of her son and then recounted that conversation to a government agent. That agent's trial testimony about the telephone call is the focus of this appeal. We hold that the district court's admission of the agent's testimony recounting Avila's description of the call did not violate the Confrontation Clause of the Sixth Amendment because the call was made primarily to address an ongoing emergency and the challenged statements were nontestimonial. We therefore affirm Liera-Morales's convictions.

## BACKGROUND

### I.  FACTUAL BACKGROUND

In 2011, Liera-Morales unlawfully entered the United States with the assistance of a human-trafficking ring and later began working for the trafficking ring to pay off his remaining smuggling fee.  As a part of his duties, Liera-Morales participated in at least one smuggling operation.  In December 2011, he picked up three undocumented immigrants in the Arizona desert and helped transport them to a trailer house in Tucson, Arizona.  One of those individuals was Aguilar, an eighteen-year-old Honduran citizen who decided to come to the United States hoping to find work and be with his mother, Sonia Avila, in Houston, Texas.

After securing Aguilar in the trailer house, Liera-Morales and other members of the trafficking ring (collectively, the "captors") began blackmailing Avila.  Avila testified that she received threatening telephone calls from the captors demanding ransom money for her son's return.[1]  During one of those telephone calls, on December 14, 2011, the captors threatened to "eliminate" Aguilar.  Fearing for her son's life, Avila panicked and then called 911.  Her 911 call was referred to Tucson Immigration and Customs Enforcement ("ICE") agents, who used geolocation coordinates to pinpoint the origin of the telephone call.  The Tucson ICE agents instructed Houston ICE Agent Jose Goyco to meet with Avila and to arrange a recorded telephone call between Avila and the captors.

---

[1] At trial, Liera-Morales denied that any of the captors, including himself, made any ransom demands or threatened to kill Aguilar.

Agent Goyco arrived at Avila's residence around 1:00 a.m. on December 15. He asked Avila to call Aguilar's captors, to try speaking directly with Aguilar, and to tell the captors that a man named "Tony" was going to meet them later that afternoon to pay for Aguilar's return. According to Agent Goyco, Avila followed these instructions and was able to speak with Aguilar during the telephone call. Seeking to gather information about Aguilar's location, Agent Goyco attempted to record the conversation but was unable to obtain an audible recording because Avila was shaking, crying, and very nervous.

After the telephone call, Avila was still "shaking" and "crying . . . like she was lost" because, as she testified, she had just "received threats about" Aguilar, specifically "that [her son] was going to be eliminated . . . his life would be taken." Agent Goyco testified that Avila told him that her son "was going to get killed," and that the captors warned that "she needed to find a way to get the money and to make sure that she was going to get the money on time and that they had until 3:00 o'clock in the afternoon and they would speak to the other person to see whether can arrange [sic]." Agent Goyco relayed this information to the Tucson ICE agents.

After Agent Goyco left Avila's house, she received another call from the captors around 11:00 a.m. During that second telephone call, she "was told to say [her] good-byes to [her] son because [the captors] were going to do away with him. He was going to be taken to the desert." Avila also spoke with Aguilar, who pleaded with her saying "Mommy, Mommy, give [the captors] the money." Immediately afterward, Avila contacted the authorities to report the second telephone call.

Later that day, Tucson ICE agents conducted a sting operation to rescue Aguilar. An undercover ICE agent, playing the role of "Tony," contacted the captors and agreed to meet them at a taco shop to pay the ransom money for Aguilar. Apparently suspicious of "Tony" and the planned meeting, the captors did not show up at the taco shop, prompting the undercover agent to call the captors to set up another meeting location. Shortly thereafter, a team of agents intercepted the captors' vehicle, searched the driver (later identified as Liera-Morales), and seized his cell phone, which matched the telephone number of the ransom calls made to Avila. Agents found Aguilar lying in the back seat of the truck, and then arrested Liera-Morales.

The agents brought Liera-Morales to the ICE field office in Tucson, where Agent Mason Nicholls interviewed him. Liera-Morales explained that "he and another man went out to the desert" south of Tucson, "picked [Aguilar] and two other individuals up," and "brought [them] to a residence . . . in Tucson." During the interview, Liera-Morales also said that he told Avila she owed "$750 for bringing [Aguilar] out of the . . . desert," that Avila had previously made arrangements to pay Aguilar's ransom, and that, on December 15, "they were taking [Aguilar] to meet up with another individual[] that his mom had arranged to make the payment."

## II. PROCEDURAL HISTORY

A grand jury returned a five-count indictment against Liera-Morales, charging him with one count each of hostage taking, communicating a ransom demand in interstate commerce, interfering with interstate commerce by threats or

violence, transporting an alien for profit, and harboring an alien for profit.

Before trial, the government filed two motions in limine. The district court granted the government's first motion, which sought to introduce Agent Goyco's testimony covering what Avila told him about the first telephone call to the captors. The district court ruled that Agent Goyco's anticipated testimony qualified as present sense impressions or impromptu excited utterances and rejected Liera-Morales's Confrontation Clause challenge because, among other reasons, the proffered testimony was nontestimonial.

The district court also granted the government's second motion with some qualifications, ruling that the government could introduce several of Liera-Morales's post-arrest statements through Agent Nicholls's testimony. The district court found that the selected statements were not misleading or taken out of context and rejected Liera-Morales's contention that Federal Rule of Evidence 106 (the "Rule of Completeness") permitted him to introduce exculpatory portions of the interview.

Consistent with these rulings, at trial Agent Goyco testified as to what Avila told him about her telephone call with the captors, and Agent Nicholls related certain statements made by Liera-Morales during the post-arrest interview.

The jury found Liera-Morales guilty of hostage taking, interference with commerce by threats or violence, transportation of an alien for profit, and harboring an alien for profit, and acquitted him of communicating a ransom demand in interstate commerce. He was sentenced to concurrent

prison terms for his convictions, the longest of which was 192 months.

## DISCUSSION

### I.  CONFRONTATION CLAUSE

The central issue in this appeal is whether the admission of statements made by Avila to Agent Goyco about the telephone conversation with her son's captors violated the Confrontation Clause.[2]  Liera-Morales argues that "[t]he unidentified trafficker's statements to Mrs. Avila were . . . testimonial" and complains that he had no opportunity to cross-examine that unidentified interlocutor.  On de novo review, we conclude that admitting the statements did not run afoul of the Confrontation Clause because they were nontestimonial in light of the particular emergency circumstances.[3]    *See United States v. Orozco-Acosta*, 607 F.3d 1156, 1160–62 (9th Cir. 2010).

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "This means that *testimonial* statements are inadmissible in criminal prosecutions unless the declarant is

---

[2] Liera-Morales does not challenge the district court's hearsay ruling that Agent Goyco's testimony qualified as both present sense impressions and excited utterances.  We therefore do not disturb that uncontested ruling on appeal.

[3] The parties dispute whether Liera-Morales was the captor who spoke to Avila during the telephone call.  We need not resolve this dispute because, regardless of who spoke to Avila, the challenged statements were nontestimonial.

unavailable and the defendant had a prior opportunity to cross-examine the declarant." *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1267 (9th Cir. 2013) (emphasis added) (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)).

The Supreme Court in *Crawford* set forth examples of the "core class" of testimonial statements, and post-*Crawford* cases have since "clarified . . . the limits of the testimonial statement category" by focusing largely on the "primary purpose" of the interrogation or investigation. *See United States v. Solorio*, 669 F.3d 943, 952–53 (9th Cir. 2012); *see also Davis v. Washington*, 547 U.S. 813, 826 (2006). For example, interrogations by law enforcement officers "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" fall within the ambit of testimonial hearsay. *Davis*, 547 U.S. at 826. By contrast, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822.

In light of the ongoing hostage situation and the risk of grave harm to Aguilar, the challenged statements fall squarely in the emergency category of nontestimonial statements contemplated by *Davis* and its progeny. Although not "dispositive of the testimonial inquiry," "the existence of an 'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the 'primary purpose' of an interrogation." *Michigan v. Bryant*, 131 S. Ct. 1143, 1157, 1160 (2011) (internal quotation marks omitted); *see, e.g.*, *United States v. Arnold*, 486 F.3d 177, 189–90 (6th Cir. 2007)

(en banc) (holding that witness's statements during 911 call shortly after fleeing from gun-wielding assailant were made during an ongoing emergency and thus were nontestimonial). The formality of a statement is also "a relevant factor in determining whether the statement is testimonial." *E.g.*, *Rojas-Pedroza*, 716 F.3d at 1268.

Viewed objectively, the circumstances here establish that the challenged statements were nontestimonial. The reason for the telephone call was "to enable police assistance to meet an ongoing emergency," *Bryant*, 131 S. Ct. at 1156 (internal quotation marks omitted), and the challenged statements were made "in spite of, not because of, the possibility of a later criminal trial," *Arnold*, 486 F.3d at 189. The captors made numerous demands for payment and, according to Avila, repeatedly threatened to "eliminate" Aguilar if those demands were not met. During the telephone call with the captors, Avila was very nervous, shaking, and crying in response to continuous ransom demands and threats to her son's life. Agents thus faced an emergency hostage situation. *Cf. United States v. Mancinas-Flores*, 588 F.3d 677, 687 (9th Cir. 2009) (amended opinion) (noting in Fourth Amendment context that "[m]any courts, including this one, have recognized that an ongoing hostage situation presents exigent circumstances").

The agents' conduct confirms that the primary purpose of the telephone call was to respond to these threats and to ensure Aguilar's safety. Agent Goyco instructed Avila to call the captors to determine her son's location and to coordinate a meeting between the captors and undercover agent "Tony." Agent Goyco then gave Avila's information to the Tucson ICE agents coordinating the rescue mission. Even though Agent Goyco later memorialized Avila's statements in a

written report, the *primary* purpose of the telephone call itself was not to establish "the facts of a past crime" or to "provide evidence to convict" Liera-Morales. *Davis*, 547 U.S. at 826–27 ("A 911 call, . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (alterations in original)); *see also Solorio*, 669 F.3d at 953–54. Significantly, Liera-Morales acknowledged at oral argument that the three purposes of the telephone call were to gauge whether Aguilar was alive, to determine the nature and extent of the hostage situation, and to save Aguilar's life.

In addition, the statements of Avila and the captor during the telephone call lacked any indicia of formality: they occurred in an informal high-stress "environment that was not tranquil, or even . . . safe" in light of Aguilar's captivity. *Davis*, 547 U.S. at 827. Given the objective circumstances, the record belies Liera-Morales's suggestion that these were testimonial statements "made to a government officer with an eye toward trial." *See Jensen v. Pliler*, 439 F.3d 1086, 1089 (9th Cir. 2006) (amended opinion).

Nor did Agent Goyco's attempt to record the telephone call render the challenged statements testimonial. He primarily sought to record the call to obtain information about Aguilar's location and to facilitate the plan to rescue Aguilar. Far from an attempt to build a case for prosecution, Agent Goyco's actions were good police work directed at resolving a life-threatening hostage situation. Although the recording, if audible, might have been used in prosecuting Liera-Morales, "this potential future use does not automatically place [the statements] within the ambit of testimonial." *See, e.g.*, *United States v. Morales*, 720 F.3d 1194, 1201 (9th Cir.

2013) (alterations in original) (internal quotation marks omitted).

Law enforcement officers, like Agent Goyco, "function as both first responders and criminal investigators," and "[t]heir dual responsibilities may mean that they act with different motives simultaneously or in quick succession." *See Byrant*, 131 S. Ct. at 1161. The record confirms that Agent Goyco's principal motive in recording the telephone call was to ensure Aguilar's safety and assist his fellow agents in executing a rescue mission. That Agent Goyco may have also recorded the call in part to build a criminal case does not alter our conclusion that the *primary* purpose of the call was to diffuse the emergency hostage situation. Consequently, the challenged statements from the telephone call were nontestimonial, and their introduction at trial did not violate Liera-Morales's Confrontation Clause rights.

## II. RULE OF COMPLETENESS

The district court admitted Agent Nicholls's testimony about portions of Liera-Morales's post-arrest interview, but precluded Liera-Morales from introducing exculpatory statements from that interview. Liera-Morales argues that the district court contravened the Rule of Completeness. Fed. R. Evid. 106. We disagree.

Rule 106 provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. By its terms, Rule 106 "applies only to written and recorded statements." *United States v. Ortega*, 203 F.3d 675, 682 (9th

Cir. 2000).  Consistent with Rule 106's text, we have recently observed that "our cases have applied the rule only to written and recorded statements." *United States v. Hayat*, 710 F.3d 875, 896 (9th Cir. 2013) (internal quotation marks omitted). Nevertheless, at least two of our sister circuits have recognized that the principle underlying Rule 106 also applies to oral testimony "by virtue of Fed. R. Evid. 611(a), which obligates the court to make the interrogation and presentation effective for the ascertainment of the truth." *United States v. Mussaleen*, 35 F.3d 692, 696 (2d Cir. 1994) (internal quotation marks omitted); *accord United States v. Li*, 55 F.3d 325, 329 (7th Cir. 1995) ("[T]he rule of completeness applied to the oral statement.").

Even if the principle underlying Rule 106 extended to the statements at issue here, *see United States v. Collicott*, 92 F.3d 973, 983 & n.12 (9th Cir. 1996), the district court did not abuse its discretion in refusing to admit portions of the interview, *see United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (holding that "if the complete statement [does] not serve to correct a misleading impression in the edited statement that is created by taking something out of context, the Rule of Completeness will not be applied to admit the full statement" (alteration in original) (internal quotation marks omitted)).**[4]**  The district court carefully and thoroughly considered the government's proffered statements from the post-arrest interview and correctly determined that those statements were neither misleading nor taken out of context.  *See Collicott*, 92 F.3d at 982–83.  Contrary to Liera-

---

**[4]** During oral argument, Liera-Morales candidly acknowledged that our reasoning in *Vallejos* controls the outcome of this case, and all but abandoned the Rule of Completeness claim raised in his briefing.

Morales's characterization, the district court's determination did not overlook considerations of fairness.

**AFFIRMED.**