**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

RAFIQ ALBERT BROOKS,
*Defendant-Appellant*.

No. 13-10146

D.C. No.
2:11-cr-02265-JAT-3

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, Senior District Judge, Presiding

Argued and Submitted
September 8, 2014—San Francisco, California

Filed November 24, 2014

Before: Mary M. Schroeder, John B. Owens,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

# SUMMARY[*]

## Criminal Law

The panel affirmed the defendant's convictions for possession with intent to distribute marijuana on November 17, 2011, and conspiracy to possess marijuana with intent to distribute; reversed his conviction for possession with intent to distribute marijuana on November 9, 2011; and remanded to the district court to determine whether resentencing is appropriate.

The panel held that admission of photographs of a parcel seized at the post office did not violate the Confrontation Clause because the photographs were not "witnesses" against the defendant.

The panel held that admission of statements by a postal supervisor, who did not testify, violated the Confrontation Clause because the statements were testimonial and offered for their truth, and there is no contention of unavailability or that the defendant had a prior opportunity to cross-examine the supervisor. The panel exercised its discretion to overlook the government's waiver as to harmlessness, and held that the error was harmless as to the November 17 possession-with-intent-to-distribute conviction and the conspiracy conviction. The panel declined to find the error harmless as to the November 9 count.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected as foreclosed the defendant's contention that the district court erred by denying his motion to suppress evidence obtained by warrantless GPS monitoring, and concluded that the district court did not abuse its discretion by denying the defendant a minor participant adjustment at sentencing.

The panel left it for the district court to determine on remand whether the defendant's sentence for the remaining convictions should be adjusted, and dismissed as moot the defendant's motion to remand based on changes to the Sentencing Guidelines.

## COUNSEL

D. Stephen Wallin (argued), The Wallin Law Firm, Phoenix, Arizona, for Defendant-Appellant.

Mark S. Kokanovich (argued), Deputy Appellate Chief; John S. Leonardo, United States Attorney; Michael A. Lee, Assistant United States Attorney, Office of the United States Attorney, Phoenix, Arizona, for Plaintiff-Appellee.

## OPINION

FRIEDLAND, Circuit Judge:

Rafiq Brooks appeals his convictions on one count of conspiracy to possess marijuana with intent to distribute and two counts of possession of marijuana with intent to distribute. At Brooks's jury trial, the government introduced out-of-court statements by a nontestifying post office supervisor and photographs of a seized package that was the subject of those statements. Brooks argues that the admission of this evidence violated his rights under the Confrontation Clause of the Sixth Amendment. We conclude that admission of the photographs did not violate the Confrontation Clause, but that admission of the postal supervisor's statements did, and we reverse the possession conviction that depended on those statements.

## I. Background

### A.

In March 2011, a task force of DEA officers and local law enforcement began investigating a group of individuals suspected of shipping marijuana through the mail. The leader of the investigation, Officer Kurt Kinsey, focused surveillance on an apartment in Glendale, Arizona. On three occasions in August and September 2011, law enforcement observed people loading boxes into a vehicle at the Glendale apartment and then driving to a post office. On each occasion, the task force enlisted the help of U.S. Postal Inspector Jeff Agster to contact the post office and search the suspected parcels. Marijuana was found each time.

Shortly after a traffic stop in late September in which officers discovered two suspected conspirators with a parcel containing marijuana, the task force observed the Glendale apartment being cleaned out—numerous boxes, bags of packing peanuts, and other packaging materials were brought down and loaded into a car. Officers continued to observe the suspected leader of the conspiracy, Koy Williams, at the Glendale apartment, leading them to believe that Williams still lived there.

On the morning of November 9, 2011, Officer Kinsey observed two men exiting the Glendale apartment and entering a silver Buick. Kinsey recognized one of the men as Koy Williams. The other man was dressed in a long-sleeve blue dress shirt, dark-colored dress pants, and a tie. Kinsey followed the silver Buick to an apartment in Phoenix.

Later that morning, Kinsey followed the Buick from the Phoenix apartment to Glendale, where he saw the Buick's driver enter a post office with a box. Kinsey contacted Agster and relayed the mailer's attire—long-sleeve blue dress shirt, dress pants, and a tie. Agster, in turn, telephoned the supervisor of the post office and conveyed the same information. The supervisor confirmed the suspect's presence in the post office and, either later in the same conversation or in a subsequent one, gave Agster mailing information, including a tracking number, for the parcel that the suspect had dropped off. Acting upon that information, Agster obtained a warrant, searched the identified parcel while taking pictures, and found marijuana. Meanwhile, a different task force member, Special Agent John Nelson, followed the Buick from the post office to a grocery store, where he was able to observe the blue-shirted driver from a short distance.

On November 17, 2011, officers arrested Brooks and four others at the Phoenix apartment. A bag next to Brooks contained $1,807 in cash, and he admitted during the arrest that the silver Buick was his rental car. A protective sweep of the apartment revealed bales of marijuana on the kitchen counter and packaging supplies throughout the apartment. One of the arrestees had three delivery receipts on his person; the three corresponding parcels were intercepted en route to New York and found to contain marijuana. After obtaining a warrant, officers returned to the Phoenix apartment and found two boxes of marijuana that were packed and ready for shipment, thirteen delivery confirmation receipts in a cereal box, and a Glock 17 handgun.

The Glendale apartment was also searched. Unlike the Phoenix apartment, which contained little furniture, the Glendale apartment appeared to be lived in. Identification documents for Brooks were found in one of the bedrooms, along with packaging materials and a magazine for a Glock 17 handgun. The bedroom's closet contained a blue dress shirt, a pair of dark slacks, and a tie.

**B.**

A grand jury indicted Brooks for conspiracy to possess marijuana with intent to distribute, possession of marijuana with intent to distribute on November 9 (the date of the mailing at the Glendale post office), and possession of marijuana with intent to distribute on November 17 (the date of arrest at the Phoenix apartment). At trial, the prosecution introduced evidence of the clothing in Brooks's closet and of his connection to the silver Buick to show that Brooks was the mailer on November 9. Agent Nelson made an in-court identification of Brooks as the man wearing a blue dress shirt

and dark slacks that he had followed to the grocery store from the post office.

The prosecution also sought to tie the man in the blue shirt to the parcel containing marijuana. To that end, Inspector Agster testified regarding his communication with the post office supervisor on November 9:

> **Prosecution:** Let's move forward to November 9, 2011. Were you contacted again by task force members regarding another parcel related to this investigation?
>
> **Agster:** Yes.
>
> **Prosecution:** What information were you given at that time?
>
> **Agster:** The information on this was they were following another subject who went to the Glendale Arrowhead Post Office in Glendale, Arizona.
>
> **Prosecution:** Did you contact the supervisor of that post office?
>
> **Agster:** Yes, I did.
>
> **Prosecution:** And in real time did you relate to him the information regarding the individual?

**Agster:** Yes. I was provided with a description of the subject that was going in to mail parcels and I relayed that information to the supervisor as well.

**Prosecution:** That same day did you obtain that parcel?

**Agster:** I did.

**Prosecution:** How did you know that was the same parcel that had been mailed earlier that day?

**Agster:** The information that was provided to me over the phone. The tracking number as well as the mailing information was the same when I got there to pick up the parcel.

The defense objected to this testimony—and to the admission of photographs depicting Agster's search of the parcel—on Confrontation Clause grounds. The district court overruled the objection. The postal supervisor never testified.

The jury convicted Brooks on all counts. The district court sentenced Brooks to 110 months on the conspiracy count and 60 months on each of the possession counts, with all terms to run concurrently.

## II. Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Brooks contends that Inspector Agster's testimony conveying out-of-court statements of the nontestifying postal supervisor, as well as photographs of the parcel seized at the Glendale post office, violated the Confrontation Clause.

We review alleged violations of the Confrontation Clause de novo. *United States v. Nguyen*, 565 F.3d 668, 673 (9th Cir. 2009).

### A.

We reject Brooks's argument that admitting photographs of the seized parcel violated the Confrontation Clause. As the Supreme Court explained in *Crawford v. Washington*, the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" 541 U.S. 36, 51 (2004). "Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (internal quotation marks and brackets omitted). The photographs of the seized parcel were not "witnesses" against Brooks. They did not "bear testimony" by declaring or affirming anything with a "purpose." Therefore, their admission did not violate the Confrontation Clause. *See United States v. Lopez-Moreno*, 420 F.3d 420, 436 (5th Cir. 2005) (holding that admission of a voter identification card did not violate the Confrontation Clause because it did not involve a witness bearing testimony).

**B.**

Allowing Inspector Agster to testify about the postal supervisor's statements, on the other hand, did violate the Confrontation Clause. In *Crawford*, the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial" if the statements are offered to "establish[] the truth of the matter asserted," unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination. 541 U.S. at 53–54, 59–60 n.9. In other words, absent unavailability and a prior chance for cross-examination, the Confrontation Clause forbids a statement of a nontestifying witness that is testimonial and offered for its truth.

### 1. Inspector Agster conveyed out-of-court statements.

There is no doubt that Agster's testimony introduced "statements" of the postal supervisor. Although the government emphasizes that the "actual statements" of the supervisor were not offered in testimony, out-of-court statements need not be repeated verbatim to trigger the protections of the Confrontation Clause. Rather, we have explained that "out-of-court statements admitted at trial are 'statements' for the purpose of the Confrontation Clause . . . if, fairly read, they convey to the jury the substance of an out-of-court, testimonial statement of a witness who does not testify at trial." *Ocampo v. Vail*, 649 F.3d 1098, 1109–10 (9th Cir. 2011). Agster's testimony conveyed the substance of the postal supervisor's statements. Agster testified that he telephoned the supervisor and provided a description of the suspect, and then later searched a particular parcel with the tracking number and mailing information he had been provided over the phone as identifying the package mailed by

the suspect.  By conveying the substance of what the supervisor said, Agster introduced "statements" for the purpose of the Confrontation Clause, even though he did not quote the supervisor verbatim.

### 2.  *The statements were testimonial.*

The postal supervisor's statements also were testimonial. In the jointly decided cases of *Davis v. Washington* and *Hammon v. Indiana*, the Supreme Court held that statements made in the course of questioning by law enforcement "are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. 813, 822 (2006).[1]  Stated differently, courts must consider whether a statement was "procured with a primary

---

[1] In its post-*Crawford* cases, the Supreme Court has described a range of interactions involving law enforcement personnel as "interrogations," including some that involved less formality than the term typically connotes.  For instance, *Davis* referred to a telephone conversation between a 911 operator and a domestic abuse victim as an interrogation, 547 U.S. at 826, and *Michigan v. Bryant* did the same for an interaction between police officers and a dying gunshot victim in a gas station parking lot, 131 S. Ct. 1143, 1150 (2011).  *See also Crawford*, 541 U.S. at 53 n.4 ("We use the term 'interrogation' in its colloquial, rather than any technical legal, sense.").  The Supreme Court has made clear, however, that a statement need not be produced by "interrogation" in order to be testimonial.  *See Davis*, 547 U.S. at 822 n.1 ("The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.").  We believe it is unnecessary to decide whether Inspector Agster's interaction with the post office supervisor was an "interrogation" because we conclude that the primary purpose of the interaction was investigative, regardless of how the interaction is labeled.

purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011). In making this determination, the goal is not to discern "the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 1156.

*Davis* and *Hammon* guide our inquiry. The events in *Davis* began with a call to a 911 operator that terminated before anyone spoke, prompting the operator to return the call. 547 U.S. at 817. Michelle McCottry answered, and when the operator asked her what was going on, she said, "He's here jumpin' on me again. . . . He's usin' his fists." *Id.* As the conversation continued, McCottry reported that her former boyfriend had just run out the door after hitting her. *Id.* at 818. The operator then gathered information about the former boyfriend, and McCottry described the assault. *Id.* McCottry did not appear at the subsequent trial, but the state introduced the 911 tape. *Id.* at 819.

In *Hammon*, police responded to a reported domestic dispute at the home of Amy and Hershel Hammon. *Id.* The officers found Amy "alone on the front porch, appearing somewhat frightened, but she told them that nothing was the matter." *Id.* (internal quotation marks omitted). One officer dealt with Hershel, insisting that he stay separated from Amy to allow the officers to investigate what happened. *Id.* at 819–20. In another room, the other officer questioned Amy about what had occurred and, after listening to her account, asked her to complete a battery affidavit. *Id.* She wrote: "Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down." *Id.*

at 820 (internal quotation marks omitted).  Amy did not appear at Hershel's trial, but the police officers testified regarding her statements and authenticated the affidavit.  *Id.* at 820–21.

The Court held that the statements in *Hammon* were testimonial and that the statements in *Davis* were not.  "[T]he nature of what was asked and answered in *Davis*," the Court explained, "was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past."  *Id.* at 827.  For example, the operator's attempt to establish the assailant's identity was needed "so that the dispatched officers might know whether they would be encountering a violent felon."  *Id.*  The informality of the call, in which the victim's "frantic answers were provided . . . in an environment that was not tranquil, or even . . . safe," also contributed to the conclusion that the statements were not testimonial.  *Id.*

By contrast, in *Hammon* there was no "immediate threat" to the speaker, and law enforcement "was not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.'"  *Id.* at 830.  "It was formal enough that Amy's interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his investigation."  *Id.* (internal quotation marks and brackets omitted).  Amy's statements in response to police questioning were "an obvious substitute for live testimony, because they d[id] precisely *what a witness does* on direct examination."  *Id.*

*Davis* and *Hammon* lead us to conclude that the postal supervisor's statements here were testimonial.  First, based on

the content and context of the conversation, a reasonable person would have understood the primary purpose to be investigative. Postal employees presumably would have known Inspector Agster to be a law enforcement officer, so when he called to ask whether someone matching a certain description was present, the most reasonable assumption would have been that the inquiry related to a criminal investigation. But even if that were not obvious at the outset—for example, perhaps one could have thought that the suspect was carrying a bomb and the call was intended to address that emergency—the investigative purpose would have become clear once the discussion turned to the details of the package's mailing information rather than, say, evacuation of the building. Thus, as the call proceeded, both participants would have known that the primary purpose of the conversation was to establish or prove facts potentially relevant to a later criminal prosecution. By working with Agster to gather incriminating evidence about the suspect, the supervisor became part of the effort to collect information necessary to make out a case against the suspect.

Second, Agster's interaction with the supervisor was somewhat formal. Unlike *Davis*, in which the contested statements were made to a 911 operator, here, as in *Hammon*, the conversation involved a bona fide law enforcement officer. Testimony must be solemn, and the Supreme Court has explained that the solemnity of oral statements to law enforcement is established "by the severe consequences that can attend a deliberate falsehood." *Davis*, 547 U.S. at 826 (explaining that false statements to federal investigators violate 18 U.S.C. § 1001); *see also United States v. McKanry*, 628 F.3d 1010, 1018 (8th Cir. 2011) (affirming a conviction under 18 U.S.C. § 1001 for a false statement to a postal inspector). Additionally, in contrast to McCottry's frantic

answers in *Davis*, here there is no indication that Agster's phone conversation was rushed. Although confirming the suspect's presence in the post office may have been time-sensitive, collecting a specific description of the parcel was not. Rather, the circumstances suggest that the pace and deliberateness of the phone call were much more similar to the interrogation in *Hammon* than to the 911 call in *Davis*.

Third, as in *Hammon*, the supervisor's statements reported "what happened"—that is, that the man in the blue shirt mailed a package bearing certain identifying information—rather than "what is happening." 547 U.S. at 830 (internal quotation marks omitted). Although the suspect's presence was confirmed in real time, there is no indication that the supervisor relayed the package's mailing information while the suspect was still at the counter mailing it. Rather, given the surrounding circumstances, we must assume that the supervisor set aside the parcel and provided the mailing information to Agster after the suspect left the post office. The supervisor's statements identifying a particular package as the one mailed by the man in the blue shirt were "an obvious substitute for live testimony" because they did "precisely *what a witness does* on direct examination." *Id.* Whereas the statements in *Davis* were nontestimonial partly because "[n]o 'witness' goes into court to proclaim an emergency and seek help," *id.* at 828, witnesses routinely do go into court to say that they observed a crime and collected evidence of it.

Finally, our conclusion that the primary purpose was investigative is reinforced by the lack of an alternative. That is, if the purpose of Agster's call was not to build a case for prosecution, then what was the purpose? The government does not suggest there was any sort of emergency, nor does

it say that Agster was trying to stop the suspect from getting away.[2]  And although Agster may have wanted to prevent the package from reaching its destination, that goal was realized once the box was set aside.  Collecting the tracking number and mailing information, and then using that information to select the parcel to be searched, was plainly done with an eye toward prosecution.

### 3.  *The statements were offered for their truth.*

In addition to being testimonial, the supervisor's statements were offered for their truth.  The government seems to suggest that the statements were offered solely to provide foundation for the admission of photographs depicting the search of the parcel, and not for their truth.  Foundational evidence is valuable, however, only if it is true.  In this respect, foundation differs from other situations in which the truth of the statement is irrelevant, such as when offered to show its effect on the listener.  Here, the prosecution was far from indifferent as to the truth of the supervisor's statements.  The prosecution already had offered evidence to prove that Brooks was the man in the blue shirt.  It wanted the jury to believe the supervisor correctly identified the package mailed by the man in the blue shirt so that it could connect the marijuana found in that package to Brooks.

\* \* \*

---

[2] The lack of emergency distinguishes this case from *United States v. Solorio*, 669 F.3d 943, 952–54 (9th Cir. 2012), and *United States v. Liera-Morales*, 759 F.3d 1105, 1109–11 (9th Cir. 2014), in which we held that statements were nontestimonial because they were offered to help resolve dangerous situations.

To summarize, we conclude that the prosecution introduced statements by the postal supervisor that were testimonial and offered for their truth.  Because the postal supervisor did not testify, and there is no contention of unavailability or that Brooks had a prior opportunity to cross-examine the supervisor, the admission of the statements violated the Confrontation Clause.[3]

## III. Harmlessness

Once a Confrontation Clause error has been shown, the government bears the burden of proving that it was harmless beyond a reasonable doubt.  *United States v. Nguyen*, 565 F.3d 668, 675 (9th Cir. 2009).  The government's answering brief, despite noting that a harmlessness analysis applies to Confrontation Clause violations, does not argue that any error here was harmless.  This constitutes waiver. *See United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100 n.4 (9th Cir. 2005) ("Although the government mentions that a harmless error analysis applies, it makes no argument on this score nor advances any theory about how any errors here were harmless.  Issues raised in a brief which are not supported by argument are deemed abandoned." (internal quotation marks omitted)).

In *Gonzalez-Flores*, we held that we have discretion to consider harmlessness sua sponte in extraordinary cases, and

---

[3] Setting aside the challenged testimony does not affect whether it was proper to admit the photographs.  Agster testified that he went to the post office following his conversation with Officer Kinsey, that he took pictures while searching the parcel, and that the photographs admitted at trial were the ones that he took.  Relevance and authenticity were therefore established without the challenged testimony.  *See* Fed. R. Evid. 401, 901(a).

that we should consider three factors to identify such cases: (1) "the length and complexity of the record," (2) "whether the harmlessness of an error is certain or debatable," and (3) "the futility and costliness of reversal and further litigation." *Id.* at 1101. "[T]he second factor—the court's certainty as to the harmlessness of the error—is of particular importance," and sua sponte recognition "is appropriate *only* where the harmlessness of the error is not reasonably debatable." *Id.*

Unlike *Gonzalez-Flores*, this case involves constitutional error. The burden to establish harmlessness is heavier for constitutional errors than it is for non-constitutional errors. *Compare United States v. Sandoval-Gonzalez*, 642 F.3d 717, 725 (9th Cir. 2011) (government must show it is more probable than not that a non-constitutional error did not materially affect the verdict), *with Chapman v. California*, 386 U.S. 18, 24 (1967) (government must show beyond a reasonable doubt that a constitutional error did not contribute to the verdict obtained). Thus, exercising our discretion to find a constitutional error harmless under *Gonzalez-Flores* requires a double level of certainty: we must be convinced that the error was "harmless beyond a reasonable doubt" and that "satisfaction of that standard is beyond serious debate." *United States v. Pryce*, 938 F.2d 1343, 1347–50 (D.C. Cir. 1991) (opinion of Williams, J., announcing the judgment) (internal quotation marks and emphasis omitted).[4]

---

[4] In addition to the D.C. Circuit, other circuits that share our standard for when to recognize harmlessness sua sponte apply that standard to constitutional errors. *See, e.g.*, *United States v. Torrez-Ortega*, 184 F.3d 1128, 1135-37 (10th Cir. 1999) (considering harmlessness of constitutional error notwithstanding government's waiver); *United States v. Parmelee*, 42 F.3d 387, 392 n.6 (7th Cir. 1994) (same).

Even under this high standard, we find that the *Gonzalez-Flores* factors favor exercising our discretion to determine that admitting the postal supervisor's out-of-court statements was harmless as to two of Brooks's three convictions—possession with intent to distribute on November 17 (the day of arrest) and conspiracy. First, the complexity of the record is modest—the result of a four-day trial. Second, even without the supervisor's out-of-court statements—or even any evidence at all regarding the mailing on November 9—there was overwhelming evidence that Brooks participated in the conspiracy and, on November 17, possessed marijuana with intent to distribute.[5] Among other things, Brooks lived with the conspiracy leader in the Glendale apartment for at least a month prior to his arrest, and the conspiracy leader referred to Brooks as his "worker." For several months, law enforcement had observed cars travelling from the Glendale apartment to post offices in order to ship marijuana, and a search of the apartment revealed packaging materials and numerous postal receipts. Brooks was responsible for a handgun found at the Phoenix apartment and the silver Buick used in the conspiracy, and he possessed almost two thousand dollars in cash at the time of his arrest. Brooks was apprehended at the Phoenix apartment, where bales of marijuana were found on the kitchen counter, along with more than a dozen mailing receipts and two sealed boxes with

---

[5] Brooks also raises a Confrontation Clause challenge to evidence suggesting that he mailed additional packages at a second post office on November 9. Because no parcel was ever searched at the second post office, there was no direct evidence that any marijuana was mailed at that post office, even if the mailer was Brooks. We therefore conclude that the evidence related to the second post office was of such minimal probative value that its presence or absence has no effect on our evaluation of Brooks's convictions, and any error with respect to that evidence was harmless.

marijuana ready for shipment. Third and finally, in light of the overwhelming evidence, remand for retrial on the conspiracy and November 17 possession counts would be futile and costly. With all three *Gonzalez-Flores* factors pointing in favor of sua sponte recognition, we exercise our discretion to overlook the government's waiver and hold the Confrontation Clause error harmless with respect to the convictions on those two counts.

Our harmlessness conclusion is different, however, with respect to the conviction for possession with intent to distribute on November 9.[6] Certainty as to harmlessness is a prerequisite for sua sponte recognition under *Gonzalez-Flores*. The government acknowledged at oral argument that any Confrontation Clause error would not have been clearly harmless as to the November 9 count. We agree. The prosecution offered substantial evidence to prove that Brooks was the man in the blue shirt who entered the post office with a box, but the supervisor's improperly admitted statements were the key evidence linking the man in the blue shirt to the seized parcel and the marijuana it contained. Absent those

---

[6] In light of Brooks's longer, concurrent prison sentence for conspiracy, the government argues that reversal of the November 9 conviction will not reduce the amount of time he serves. Even if that is true, it does not render reversal unnecessary because the conviction carries a special assessment of $100. 18 U.S.C. § 3013(a)(2)(A); *see Ray v. United States*, 481 U.S. 736, 736–37 (1987) (per curiam) (holding that review of each conviction was required despite the defendant's concurrent prison terms because each conviction carried a $50 assessment). And even without the special assessment, we still could not decline review. *See United States v. DeBright*, 730 F.2d 1255, 1258–60 (9th Cir. 1984) (en banc) (overturning the concurrent sentence doctrine, under which we formerly had authority to decline consideration of an alleged error impacting one count on the ground that an equally long or longer concurrent prison sentence had been imposed on another count).

statements, we cannot say with certainty that the jury would have reached the same verdict, particularly given that certain evidence at trial supported the possibility that Brooks mailed something other than marijuana. We thus decline to find the Confrontation Clause violation harmless as to the November 9 count.[7]

## IV. Other Contentions

In addition to the Confrontation Clause issue, Brooks argues that the district court erred by denying his motion to suppress evidence obtained via warrantless GPS monitoring and his request for a minor participant adjustment at sentencing. These arguments can be dealt with summarily.

Brooks's contention regarding GPS monitoring is foreclosed by *United States v. Pineda-Moreno*, 688 F.3d 1087, 1090–91 (9th Cir. 2012), in which we held that the exclusionary rule does not apply to evidence obtained from a GPS device placed on a suspect's car prior to *United States v. Jones*, 132 S. Ct. 945 (2012).

Brooks is also mistaken that the district court abused its discretion by denying him a minor participant adjustment at sentencing. Brooks did not show that he was substantially less culpable than his co-conspirators. *See United States v. Cantrell*, 433 F.3d 1269, 1282–83 (9th Cir. 2006). Ample

---

[7] We leave it for the district court to determine in the first instance on remand whether Brooks's sentence for the remaining convictions should be adjusted. Because the district court may consider on remand any sentencing arguments it finds appropriate, we dismiss as moot Brooks's motion to remand based on changes to the United States Sentencing Guidelines.

evidence supported the district court's conclusion that Brooks was deeply embedded in the conspiracy.

## V. Conclusion

For the reasons discussed above, we hold that admission of the postal supervisor's out-of-court statements violated the Confrontation Clause. Although we exercise our discretion to overlook the government's waiver and hold the error harmless as to two of Brooks's convictions, we decline to do so with respect to his conviction for possession with intent to distribute on November 9, 2011. Accordingly, we **AFFIRM** Brooks's convictions for possession with intent to distribute on November 17 and conspiracy, **REVERSE** his conviction for possession with intent to distribute on November 9, and **REMAND** to the district court to determine whether resentencing is appropriate.